and I would like to reserve 5 minutes for rebuttal please. Very well. If it please the court, Michigan Assistant Attorney General Gene Marie Miller on behalf of defendant Susan Chekopshaw, who is the only defendant remaining in this case. We're here because the district court was wrong when it found that on the record presented in this case that there was a question of fact as to whether or not defendant Chekopshaw was entitled to qualified immunity. The facts as presented, as alleged and presented, when taken in the light most favorable to the plaintiff Sonya Bradley, simply do not demonstrate a constitutional violation. In fact, the district court was correct when it granted our motion to dismiss Ms. Bradley's racial discrimination claims when it found that she fails to demonstrate the actions of the defendants were racially premised. That was true of the allegations in the complaint and even after full discovery, there is still no evidence to support any sort of racial animus or bias on the part of Ms. Chekopshaw. The only claim that is left is a 1983 claim that Ms. Bradley was subjected to a racially hostile work environment in violation of the 14th Amendment. The evidence in this case is clear, in fact I believe it's unrebutted, that there is no evidence of racial animus on the part of Ms. Chekopshaw. This court in Morris versus Oldham County made it very clear that you must establish bias on the part of, bias or animus, on the basis of a protected classification, in this case it would be race. Here Ms. Bradley herself has admitted that Ms. Chekopshaw treated all employees under her supervision the same. The most she has alleged is that Ms. Chekopshaw was, and I believe her word, Ms. Bradley's words was a bully, she's a strict supervisor, but that she was a strict supervisor to everyone. Critical in this case, and we've alleged it in the facts, and in fact I even quoted the deposition testimony, when I asked her, explain to me how you believe you were treated differently and an offensive environment was created on the basis of your race, she pointed to a number of facts. The first fact was she said, well she treated me poorly and she treated some other employees poorly too. When I asked her to name those employees, interestingly the only employees she named were Caucasian employees. She then said, to my surprise, that Ms. Chekopshaw treats everybody the same, and when I said everybody, her response was white and black, Asian, Mexican, and Puerto Rican. That does not establish any sort of racial animus, it establishes that Ms. Chekopshaw was a strict supervisor who wanted all of her employees to follow the department's policies and procedures. Didn't she argue though that while she made the allegations that you just mentioned, made the statements, didn't she sort of hone in on the broad differences in the treatments of the two offices, those that were comprised primarily of people of color and those not, Lansing and Detroit? Well, the only discrepancy in treatment, and there's one incident that she alleged where the two offices were treated differently, that was relative to a holiday party where she claims that the folks in Lansing were given a longer lunch while the folks in Detroit were not given a longer lunch. That's one incident, even if it's true, it's one incident, and Ms. Chekopshaw denies that, but even if it's true, it's one incident, and that certainly doesn't arise to the level of severe and pervasive. The other thing that she alleges is, well, Amy Gania, the other secretary supervisor, was not treated the way I was. She wasn't given negative performance appraisal, she wasn't given work deadlines, she wasn't told she was not meeting her performance objectives. I want to go back and ask you a hypothetical, because let's assume hypothetically that the statement that she made about the difference in the two offices, let's assume for purposes of my hypothetical that that's correct, and that further, that there were multiple instances of that kind of conduct. In that case, would a disparity in the treatment of the two offices based upon their racial makeup, could that give rise to a claim under Title VII jurisprudence, hypothetically? Hypothetically, yes. We don't have that here, though. I understand that. That's why I made the hypothetical. Hypothetically, I do believe. I do believe that all of the things she alleges could form the basis of a racially hostile work environment, which is what she's alleged here, if we had evidence of racial bias or she was being treated differently than anyone else. The facts are clear. She says, I'm treated differently like everyone else. She claimed, I was denied leave time, and then when I, she says, other people were too. White employees. She says, other employees were given comp time and I wasn't. I said, well, who was given comp time? She pointed to an employee by the name of Pierre King, who was African American as she was, so that she couldn't point to anyone. The only thing she points to is this holiday party. Is it only one holiday party? It's one holiday party. And it's only because they wanted the lunch extended another hour? Is that what it was? Correct. Well, she also invited the white employees to her house. Are all the Lansing employees Caucasian? Yes. Okay. And all the Detroit employees are African American? No. No. No, there are Caucasian employees in the Detroit office. Okay. Now, you say, all right, even if there was some sort of, this one incident of the holiday lunch somehow was racially based, that you say it's not a hostile work environment because it's not severe and pervasive. If this were a wrongful discharge case, and the argument was I had to quit my job because of the hostile work environment, the standard, at least in Michigan, would be an objective standard that a reasonable person could not tolerate the working conditions the way they are, and therefore, they are so hostile that it forced a reasonable person to quit. What is the standard in the federal 1983 law for hostile work environment? You say severe and pervasive, but is it an objective standard, and is it a standard that no objective person could tolerate it? It is an objective standard. It's the same standard under 1983 as it would be under Title VII. Can you, under these facts, determine that a reasonable, well, first of all, whether or not the work environment was severe and pervasive is not based upon, well, severe and pervasive under the case law, and we cite in our brief a number of cases. You might think it's severe and pervasive, but a subjective thinking isn't sufficient, is it? No, subjective thinking, a subjective impression isn't evidence under, whether it be Michigan law, Title VII, 1983. Also this is a single incident. That is correct. It's not like this holiday lunch was a policy year after year after year that was just totally intolerable, right? Didn't she testify that the sign-in and sign-out policy was enforced differently in the two offices? She testified that she believed it was enforced differently, but Ms. Chekupshaw, Ms. Katula, and Ms. Taylor said, no, everyone had to sign in and out, and we, in fact, we produced records to them showing that everyone had to sign in and out. Can you get back to the standard hostile work environment? The standard for hostile work environment, the employee has to show, let me get to that so I can cite the case. The Sixth Circuit in Hafford v. Snyder said that the person has to show that they're a member of a protected class, that they're subjected to unwelcome harassment, that the harassment was based upon race, and that it was severe and pervasive, and when you get to severe and pervasive, the court is clear that one incident standing alone is not enough, and that the court, this circuit has found in a number of cases that negative performance appraisals, being told you're not doing a good job, even though you subjectively feel that it's severe and pervasive, is not enough to show severe and pervasive. There has to be a pattern and practice of conduct directed on the basis of race, which we do not have here. What we have here is a strict supervisor who treated, by Ms. Bradley's own assertions, all employees the same. She likes to point to Amy Gunea, but there is no evidence that Amy Gunea had any performance issues. The plaintiff took no discovery as to Ms. Gunea. No, she wasn't given a negative appraisal, no she wasn't. Bradley was a supervisor, right? She was, and so was Ms. Gunea. Was she supposed to have been subjected to this sign in, sign out policy as a supervisor? Everyone was, even the attorneys. The attorneys would all be supervisors of the support staff. I see my time is up, so unless the panel has questions, I will wait for the bottom. Your client lives in Lansing, right? Correct. As she ever invited, Detroit from Lansing is probably an hour and a half? Correct. I mean, has she ever invited the Detroit employees to come to her house in Lansing for a holiday party? I mean, it seems like it would be inconvenient for one thing. She has not. As far as I know, she has not, and there's nothing in Lansing. Your client also, based in Lansing, goes to the Detroit office at the Cadillac place one day a week? She averaged, she'd like to average one day a week, depending upon- Right, so she's actually only there in person one day a week, allegedly creating this hostile work environment. Correct, which is why midway through the time period we have involved in this case, Ms. Chekopshaw, the Department of Attorney General and the Department of Labor, who she was actually gave her an on-site supervisor, Peter Catullo, who the court has dismissed the claims against. The other allegation they have is regarding Mr. Lockman, who I think is also in the Cadillac place, is he not? No, he ... Do you know, I'm not sure where Mr. Lockman, what office he worked in at that time. He's actually in the Lansing office now. At this time, I don't know whether he was in Detroit or Lansing. But he used to be in the Cadillac place with the plaintiff? I mean, when he made these disparaging comments to her, was that when they were both in the Cadillac place? Yes, during Ms. Bradley's first term of employment with the Department of Attorney General. Does plaintiff allege Ms. Bradley ever alleged that she told your client about Mr. Lockman's comments? No. Do you know if it was in her personnel file? Her complaint may have been in her personnel file. I don't know, but supervisors at the Attorney General's office, I am one, do not have access to the HR personnel files. Okay. When they took your client's deposition, did they ask her if she reviewed the ... Well, they did ask her if she was aware of Lockman's comments, and she said no, right? She said she was not. All right. Do they have any evidence to the contrary? No. You said that ... Well, you didn't say, but you agreed with Judge Griffith that Ms. Chekhov-Shaw visited the Cadillac office about once a week. You're not asserting that the physical separation in the two places would prevent there being the possibility of a hostile work environment? I don't assert that. I think it is a factor that goes into the analysis of severe and pervasive. A person could be many miles away and affect policies and procedures that could foster or create a particular work environment, correct? If they're directed towards that person, correct. I would agree with that. Okay. Then on the issue of the holiday party and the distance between Lansing and Detroit, wouldn't the factor of convenience or inconvenience be one that should be made by the person invited? Isn't that the case? The fact that it might be an hour and a half away and might be inconvenient for the Detroit people, isn't that something that the staff in Detroit, a decision that they would make rather than the party host? If the party was during off work hours, I would agree, but when it comes to having staff drive three hours round trip on state time to attend a holiday party. These holiday parties were always during work hours? They were during work hours. They were holiday luncheons. Ms. Chekhovshaw didn't go to Detroit and host a holiday party for the people there? She did in years past. This particular year, she did not go to the Detroit party. The supervising staff- She did in years past? She had gone to the Detroit party. Okay. This particular party, when Ms. Bradley is back there, the party was organized by the supervisors and the staff in the Detroit office. The Lansing party, Ms. Chekhovshaw hosted that party, correct? She chose, the department actually, the division in Lansing, chose to have the party at her home. Right. Well, I mean, they can't have a party at their home- No, exactly. Unless she opens up her home to them. Correct. Thank you. Is there an explanation for why on the day of her leave, or right before her leave, she got a pile of work? Well, the work that she was given when she was scheduled to go on a leave was work that she should have been completing over the many days, weeks, and months beforehand. She was repeatedly reminded, and under the policies, and I believe Ms. Bradley agreed during her deposition, leave is granted according to the needs of the department. If you have work that is due to be completed and assigned to you, and you don't have it done, you may not be able to go on leave. They needed to ensure that her work was being done, because as we pointed out, one of her mistakes cost the department the ability to challenge a claim, which resulted in several hundred thousand dollars worth of loss to the taxpayers. All right. Any further questions at this time? Ms. Miller, you'll still have your rebuttal time. Thank you.  Good morning, Your Honor. Thank you, Honorary Police Department. Rodney Williams on behalf of the plaintiff. Certainly, Your Honors, this case is more than what the defendant says it is. In relationship, and that is why the district court judge denied their motion for qualified immunity, because certainly when you look at the facts in this particular matter, it is subject to a Section 1983 statute that says you should be free from racial discrimination in the workplace. Certainly, in this particular case, this is based on a hostile work environment based on race. Well, it was based upon racial discrimination. You had a claim against the defendant, did you not? Correct. And the district judge dismissed that claim? He dismissed the claim related to racial discrimination, however . . . Have you filed a cross appeal? No, we have not, Your Honor. Why not? Certainly, in this particular case, we felt that certainly the hostile work environment was the strongest argument here as well. And so looking at . . . It's all right. And so looking at this particular area, we looked at was it the hostile work environment focused on clearly established rights of the plaintiff, and we believe there were. And so when we looked at that, we looked at the issue related to Mr. Lockman's comments and the fact, from our perspective, that the defendant knew about those comments, in fact, mentioned that to the plaintiff when she first transferred under her control. That the defendant knew of the comments? That's what? That is correct. Our argument is . . . What evidence do you have to support that? Right. So in relationship, definitely the statement of the plaintiff . . . Which is what? Which is that at two occasions that the defendant communicated, I'm going to bring Mr. Lockman back here. That doesn't show that she has knowledge of Lockman's comments, does it? It does not directly. Our position is, of course, is that through the circumstantial evidence that we can provide at trial, that we can demonstrate whether, in fact, that's a credible statement that she did not know, given the fact . . . What circumstantial evidence do you have? Given the fact that the person who elevated this issue, that required an investigation of Mr. Lockman, was the subordinate of a defendant. So it was another attorney in the defendant's office who elevated it to the AG's office, Attorney General's office. And so our position, of course, is that not only did others knew about it in the senior Since her subordinate, another attorney, elevated it to the senior level at the AG's office, that certainly the defendant also knew about that issue. So you're saying that when she said on two occasions, I'm going to bring Lockman over here . . . Correct. I think defendants are saying, well, that was because he had a particular expertise that she thought the office could use. And you're saying that that's just totally disingenuous that she knew about this comment that Lockman had made. And that's correct, Your Honor. We look at the circumstances, totality of the evidence, or the circumstances. So who was the employee that forms the link in that chain? Who was the employee that reported it or . . . Right, Your Honor. So the employee who reported it is one of the subordinates of the defendant. What's that person's name? Do you know? In fact, I don't know the name right offhand, but we did get some information and it was still being investigated when they filed the motion for qualified immunity. Did you take his deposition, whoever this person is? We did not, Your Honor. Did you have discovery in the case? We did, Your Honor. How long? Discovery was, I think, four months. So this purported expertise that Mr. Lockman had that might have been useful, do you concede that he had some expertise in whatever was lacking? No, Your Honor. In fact, we look at the timing of the statement. The timing of the statement, it was two occasions. First occasion was when Ms. Bradley, the plaintiff, went to that particular employment, transferred there, and indicated that she needed to change some things in the office. I'm sorry. Bradley went to who? To the defendant? Right, so when the plaintiff transferred from the AG's office to another department within the state, the UIA, she was still assigned to the Attorney General's office, although she was transferred to another agency. And because she was still assigned to another agency and reported still to the defendant, even though she was in another agency, when she first started as the division head secretary, she was trying to make some changes within the office, communicated directly to the defendant about the changes, and the defendant said, well, I think I'm going to bring Mr. Lockman back here. Well, I think I'll hire Mr. Lockman, at that particular time. Secondly, she said it when... The plaintiff said, don't do that because he's harassed me before. I mean, she didn't say that. She didn't say anything, did she? She didn't say anything. I mean, the most logical inference from that is that, okay, you need extra help, I'll bring somebody in here. I think Lockman was working in the same building, wasn't he? Time, Cadillac Place? My understanding is that's correct. I mean, on the same floor? Right, Mr. Lockman is an attorney. Yeah, is he working on the same floor? I have no knowledge of whether it was the same floor or the next floor. Okay, real close to the plaintiff anyway. Don't bring him in this part of the building, though, I guess. Correct, and so, Your Honor, certainly Mr. Lockman was an attorney. She was seeking help in her secretarial work, one. Secondly, the second time was when the plaintiff raised a concern about the misuse of a government credit card. While she was on leave, another person used her credit card. She reported elevated that issue. When she elevated that issue, that's the second time that the defendant said, hey, I think I'm going to be Mr. Lockman. I'm going to hire Mr. Lockman here. We believe, of course, that was intimidation based on the understanding of the racial connotation of that. That she knew, of course, that there was a prior issue between Mr. Lockman and the plaintiff, used that to intimidate based on race. Just because the defendant did not argue or did not say any racial disparities, she used it, though. She used it as a mechanism to intimidate. Well, if it's that clear, why did you allow the district court to dismiss the race discrimination claim? I find it contradictory that you claim that her conduct's all based on race, but the district judge, Judge Drain, said, no, you have no evidence of racial discrimination by the defendant. No intentional discrimination, no circumstantial discrimination, that you have no evidence of discrimination based upon race about the defendant, but nevertheless, she persists with the hostile work claim, which is theoretically possible, but you normally need more than the lack of evidence of discrimination by the defendant. I don't see how you have anything. Your evidence has all been found insufficient already. However, though, Judge Drain did, in his decision, argue that in fact ... Yeah, he put credence to this holiday party, this one incident, and said that that could create a jury issue of hostile work environment. My question is, is that severe and persuasive enough, one incident like that? I don't think so. We would argue that, in addition to the holiday party, certainly we looked at all the other things that occurred as well. We looked at the denial of leave, denial of vacation, the denial of reassigning or allowing a white counterpart colleague to be a superior person to the plaintiff, equal in rank, equal in pay, but requiring the plaintiff to report to the equal person that's not even in the state, the area that they were sitting in, so they weren't even in Detroit, and so requiring that the plaintiff actually follow someone who's equal. Well, they had a reason for that. I mean, wasn't ... Your client was head of a group, and this other person was head of a whole division? No, the plaintiff was the division head secretary. So was the other party. But ... I think maybe she was the department head secretary or something. Wasn't there some difference? There may have been a difference in the AG's office, but the plaintiff wasn't working for the AG's office. This business about signing in and out, is it ... Do you accept that they had to do the same thing in Lansing? We accept that they were required to, but we don't accept that they did. And what's the evidence you ... You're saying the policy was enforced disparately by ... Absolutely. Absolutely. So certainly, they ... In fact, they did provide the sheets, and we did see that they weren't accurate, meaning that they didn't sign all the time. But we do know that the African-American secretaries did every day, or they were counseled. Okay, so this ... You introduced evidence, or you supported your response to the motion with some evidence that it really wasn't required in Lansing. That's correct. Was that deposition testimony, or sheets, or what? That was sheets from the Detroit office. So they argued that both the attorneys and the staff had to sign in and out. That's what they argued, but it was not true. Okay, but what about the Lansing? What was the evidence that they didn't have to in Lansing? There was no evidence that they had to sign in and out sheet in Lansing. There was no evidence that they had to? Correct. That's just what the defendant said? That's correct. I see. Okay. And so, Your Honor, certainly we believe that looking at the totality of the evidence, looking at the facts significant to this particular case, that certainly the judge drained ... But what do you do about her testimony that the defendant was just awful to everyone? Yes, certainly, Your Honor. In relationship to that, I don't disagree that she probably was mean to everyone. The fact of the matter is that does not give her the right ... She shouldn't have a shield of protection with qualified immunity just because she discriminates against everyone. Certainly, it's not in her job description to do that. It's not in relationship to the normal course of her job to do that. So she should not then say, you know, I'm a mean person. I discriminate against Asians, whites, blacks. I don't care. So I should be shielded because that's who I am. Well, then ... I mean, I guess that would work as long as there was some indication that what she was doing had a racial component to it. Correct. In this particular case, we believe it did. Tell me again, that's because of the Lachman comment? Correct. And what else? That's because of the Lachman comments. We believe it's then because the plaintiff refused to obey the defendant based on that intimidation. She started getting counseling, statements, letters of reprimand, lower ratings, even denial of sick, denial of comp time. When she went on medical leave, came back with a cane, would not allow her to assign her work to her staff. So it required her to get up every day and walk across the whole area with a cane. When she said, I got staff to do that, they said, no, that's your job. So we're not going to give you any flexibility here, because this is the process that we want to follow. And this was Taylor doing this? This was checkup show, the defendant checkup show. Okay. So, Your Honor, in relationship to those arguments, we believe that qualified immunity is not appropriate here, that they have not met their burden. We would ask that you affirm the district court decision. Any further questions? Thank you, Mr. Williams. Rebuttal? Briefly, I don't believe I will take my entire five minutes. It's not discrimination to treat everyone the same. The 14th Amendment or Title VII do not require, are not a civility code. Okay, but if you include in your mistreatment racial overtones, then I think it is. And it doesn't matter that you also abuse other people. But here, we have the plaintiff's subjective belief that she believes it was because of her race. There is nothing objective. Well, let's talk about Ms. Bachman. All of a sudden, she suggests that she's going to bring this lawyer in to help this head secretary do her job. I mean, what's the basis of this? Well, she was bringing – Ms. Checkupshaw denies that this comment was made. So to say what's the basis for it, I can't give a basis because my client denies that it was made. Okay, well – So I can't – my client has never offered an explanation for something she says she didn't do. Right, so then that's a problem, isn't it? No, because Ms. Bradley still has to show – let's assume it was made, that Ms. Checkupshaw knew what the underlying conflict was between her and Mr. Lockman. For all she knew, for all Ms. Bradley could – or Ms. Checkupshaw could have known, is Mr. Lockman told Ms. Bradley, you know, you bring in tuna for lunch and I don't like the smell, and there was a conflict over something they were eating for lunch. Isn't that an issue of fact that's not appropriate for us to decide on summary judgment? Isn't that something the jury should hear and determine the credibility of the parties asserting it and denying it? Not when that's the only incident that even hinges – that even Ms. Bradley's own testimony hinges on race. Mr. Lockman was investigated for making the statement it was alleged, but there's – even Ms. Bradley hasn't come forward with any evidence that Ms. Checkupshaw knew what that was, and that's one incident. It's one incident. It doesn't arise to severe and pervasive. And it's interesting, for the first time today I heard that – an allegation that Ms. Checkupshaw somehow supervised the person who brought this to the department's attention. Ms. Checkupshaw was a supervisor, but she didn't supervise every attorney. And she was – Mr. Lockman was never in her division. So I don't know how she could have supervised the person who made this. But we don't have facts in the record regarding that, just like – and I want to point out, we do not have anything in the record regarding the signing in and out sheets. Plaintiffs – or Ms. Bradley's counsel admitted, I got the sign in and out sheets. He didn't use them in court. He didn't introduce them. He didn't put them in record to say, see, Lansing didn't have to do this. He failed to present that evidence when he had the opportunity to do it. He only has Ms. Bradley's testimony that, I don't believe the folks in Lansing had to do it. And she admits she never worked in Lansing. What about this phone call where somebody is basically saying we're going to fire everybody in Detroit? Ms. Bradley has alleged that following the end of a conference call, Ms. Checkupshaw left the room. And two other individuals who worked in Lansing made a comment that said, we're going to get – we need to get rid of the folks in Detroit. That's not a comment that Ms. Bradley made or that Ms. Checkupshaw made. And there was no evidence to support the fact that Ms. Checkupshaw authorized it or even knew it was made. Ms. Bradley's own testimony says she wasn't in the room. She didn't make the comment. They would have conference calls on a regular basis between the management staff. And one other thing I want to clear up, and I believe it's in the record. The setup of the division was Ms. Checkupshaw was the supervisor of the labor division, the division chief. There was a division head secretary and attorney general employee, Amy Gunea. And within the labor division, there were various sections. You had an unemployment section, a workers' comp section, and a civil service section. Ms. Bradley supervised the support staff in the unemployment section. One of three equal – one of three sections that then reported to the division chief and her secretary. Any further questions? Thank you, Ms. Miller. Thank you. Case will be submitted.